EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JONATHAN GALATZAN
Assistant United States Attorney
Asset Forfeiture Section
California Bar No. 190414
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2727
    Facsimile: (213) 894-7177
    E-mail: Jonathan.Galatzan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>   vs.<br><br>REAL PROPERTY LOCATED IN BRENTWOOD, CALIFORNIA (TWYNHAM) AND $13,271.07 SEIZED FROM PREMIER AMERICA CREDIT UNION ACCOUNT NUMBER XXXXXX5967,<br><br>         Defendants.<br><br>BRADLEY MARTIN LEWIS TWYNHAM AND MARIEL TWYNHAM,<br><br>         Titleholders and Claimants. | NO. CV 15-6794 RGK (AJWx)<br><br>VERIFIED SECOND AMENDED COMPLAINT FOR FORFEITURE<br><br>[18 U.S.C. § 981(a)(1)(A) and (C)]<br><br>[F.B.I.] |

For its claims against the defendants $13,271.07 seized from Premier America Credit Union account number XXXXXX5967 and real property located in Brentwood, California, plaintiff United States of America alleges as follows:

## JURISDICTION AND VENUE

1. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(C).

2. This court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

## PERSONS AND ENTITIES

4. The plaintiff is the United States of America.

5. The defendants are $13,271.07 seized on September 2, 2015 pursuant to a federal seizure warrant from account number XXXXXX5967 at Premier America Credit Union, 19867 Prairie Street, Chatsworth, California (the "defendant bank funds"), and real property located in Brentwood, California (the "defendant real property"), titled in the name of Bradley Martin Lewis Twynham and Mariel Twynham, husband and wife as community property, with Assessor's Parcel Number 4265-011-111, and more particularly described as follows:

> Parcel 1:
> An undivided 1/8th interest in and to Lot 1 of Tract No. 52696, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 1258, Pages 87 and 88 of Maps, in the Office of the County Recorder of said County. Except therefrom Units 1 through 8 inclusive, as shown and defined upon the Condominium Plan recorded December 14, 2001 as

```
        Instrument No. 01-2395089, Official Records of said
        County.  Excepting therefrom the exclusive use common
        area easements for balcony area, deck/roof area, and
        parking area designated as "B", "D", "R" and "P", in,
        over, across and through those portions of the common
        area as shown on the above referred to Condominium
        Plan.

        Parcel 2:
        Unit 8 as shown and defined upon the Condominium Plan
        referred to in Parcel 1 above.

        Parcel 3:
        An exclusive use common area easement for all uses and
        purposes of a balcony area, deck/roof area and parking
        area to be appurtenant to Parcels 1 and 2 above, in,
        over, across and through that portion of the "Common
        Area" designated and delineated as "B", "D", "R" and
        "P" which bear the same number as the unit referred to
        in Parcel 2 above, followed by the letters "B", "D",
        "R" and "P" on the above referenced Condominium Plan.
```

6. A grant deed dated March 24, 2014, and recorded with the County Recorder on April 11, 2014, as Instrument No. 20140369221 shows title to the defendant real property is currently held in the name of "Bradley Martin Lewis Twynham and Mariel Twynham, husband and wife, as community property with Right of Survivorship." According to a title report issued by Title 365 with an effective date of July 16, 2015, there is a deed of trust against the defendant real property to secure an indebtedness in the amount of $1,038,000.00 recorded on April 7, 2014, as Instrument No. 20140369222, in favor of Premier America Credit Union. The government does not seek to forfeit the interests of Premier America Credit Union in the defendant real property.

1    7.   The interests of Bradley Martin Lewis Twynham, Mariel Twynham, and Computer Sciences Corporation may be adversely affected by these proceedings.

2    8.   The defendant bank funds are in the custody of the United States Marshals Service in this district, where they shall remain subject to this court's jurisdiction during the pendency of this action.

### EVIDENCE SUPPORTING FORFEITURE

9.   Between at least October 2013 and the present, certain shareholders of ServiceMesh, Inc. of Santa Monica, California ("ServiceMesh"), engaged in a scheme to fraudulently inflate the revenue of ServiceMesh in order to generate unwarranted, incentive-based compensation for ServiceMesh shareholders and generate bribes and kickbacks to their accomplices. The result of this scheme was that the publicly traded company (Computer Sciences Corporation) that acquired ServiceMesh in October 2013 overpaid a variable incentive payment to ServiceMesh and its shareholders by approximately $98 million.

**The Principals**

10.  Eric Pulier ("Pulier") was the founder and, through affiliated entities, approximately 30% owner of ServiceMesh, an information technology ("IT") services company based in Santa Monica, California. Pulier was also the founder and owner of TechAdvisors LLC, a Delaware corporation.

11.  Andrew Goldstein ("Goldstein") was Pulier's longtime friend and the control person for Ace Inc., aka Ace Foundation ("Ace"), a purported non-profit entity incorporated in Delaware. On an IRS Form W-9 completed by Goldstein for Ace on May 30,

4

1  2014, Ace's address was initially listed as ServiceMesh's
2  corporate headquarters in Santa Monica, California. This was
3  subsequently crossed-out and replaced with Goldstein's residence
4  in Beverly Hills, California. On or about January 14, 2015,
5  after the commencement of investigations by both Australian
6  criminal authorities and Computer Sciences Corporation ("CSC"),
7  Ace changed its name from Ace Inc. to Ace Foundation.

8      12.  Jon Waldron ("Waldron") and his supervisor, Keith
9  Hunter ("Hunter"), were IT executives at Commonwealth Bank of
10 Australia ("CBA"), the largest publicly-traded company in
11 Australia. Hans Gyllstrom ("Gyllstrom") was an IT consultant to
12 CBA since 2007.

13     13.  Bradley Martin Lewis Twynham ("Twynham") was a
14 ServiceMesh employee based in Australia and, later, California,
15 who helped manage the relationship with CBA.

16     14.  CSC is a New York Stock Exchange listed company,
17 headquartered in Falls Church, Virginia, and also involved in IT
18 services.

19     **The Contract**

20     15.  Pursuant to an agreement entered into on October 29,
21 2013 and amended on November 15, 2013, CSC agreed to acquire all
22 of ServiceMesh's outstanding stock for a fixed cash amount at
23 closing plus a variable incentive payment ("Earnout Amount")
24 based on ServiceMesh's revenues between January 1, 2013 and
25 January 31, 2014 ("Earnout Period"). For every $1 in
26 ServiceMesh revenue generated during the Earnout Period in
27 excess of a $20 million floor, ServiceMesh shareholders would
28

1  collectively receive approximately $10.15 in Earnout Amount, up
2  to a maximum of approximately $137 million.
3      16.  In February 2014, CSC calculated that ServiceMesh had
4  generated approximately $29.7 million in revenue creditable
5  toward the Earnout Amount, including approximately $10.4 million
6  attributable to CBA.  As a result of generating approximately
7  $9.7 million in revenue in excess of the floor, ServiceMesh
8  shareholders were credited an Earnout Amount of approximately
9  $98 million.  Without the revenue attributable to CBA,
10 ServiceMesh shareholders would not have received any Earnout
11 Amount.

### The ServiceMesh/CBA Relationship

13     17.  ServiceMesh began providing IT services to CBA in
14 2009.  Waldron, with direction from Pulier, actively lobbied CBA
15 to hire Hunter as Waldron's supervisor at CBA and encouraged
16 Hunter to accept the position.  On April 10, 2010, Pulier sent
17 an email to Waldron regarding an upcoming dinner hosted by
18 ServiceMesh for Hunter.  Pulier said, "The purpose of getting
19 Keith [Hunter] with you earlier (before he gets the job) is to
20 establish you as the go-to guy…leave him with a few take-aways:
21 he wants the job, he is not in it alone, there are people at the
22 bank that he can rely upon and trust."
23     18.  On July 27, 2011, Hunter's first day of employment at
24 CBA, Pulier sent an email to Hunter profiling several CBA
25 executives and projects, concluding with, "We have your back on
26 every level."
27     19.  Pulier, Waldron, Twynham and Gyllstrom had a
28 longstanding social connection.  In a July 2010 email, Twynham

informed Pulier that Waldron had been advised by a senior CBA executive not to personally approve travel for Twynham and Pulier as "it would be a conflict of interest" and mentioned Waldron's "birthday bash in Canne [sic] as evidence of hos [sic] friendship with you." In addition, Waldron invited Gyllstrom and Pulier to an April 2011 bachelor party for Twynham in Sydney, Australia. Twynham was best man in Waldron's 2012 wedding, to which Pulier was invited.

20. On May 24, 2011, Waldron sent an email to Pulier and Twynham that provided, "Where the money goes…(confidential of course)." Attached to the email was a document labeled as confidential and containing CBA's budgeted IT spending for 2011 and 2012.

21. The following emails demonstrate efforts by Waldron and Hunter to expedite the consummation of a deal whereby CBA would purchase security technology products by McAfee, Inc. ("McAfee") from ServiceMesh (the "CBA-McAfee" transactions) rather than continuing to procure them directly from McAfee or via equipment purchased from another vendor that included McAfee products.

22. On October 31, 2013, the day after the CSC acquisition of ServiceMesh was announced, a CBA colleague sent an email to Waldron responding to his inquiry about the current McAfee relationship, stating that it generated $2.4 million per year in business between CBA and McAfee. Later that day, Waldron forwarded that email to Hunter with his own message, "This is what I'm aiming to get thru on SM [ServiceMesh] paper. Have checked, and since the licenses are perpetual the full amount

qualifies as in-year revenue. So here's $7m for them. It's now with Brad [Twynham] and Eric [Pulier] to sign up a partner agreement with McAfee."

23. On November 2, 2013, Twynham sent an email to Waldron asking if Waldron had "been able to find me a contact at McAfee to talk with?" Waldron forwarded the email to a CBA colleague, who at the instruction of Waldron sent directly to Twynham the contact information for CBA's relationship manager at McAfee.

24. On December 9, 2013, Twynham sent an email to Waldron indicating that ServiceMesh's proposal for the CBA-McAfee deal would be $8.8 million for three years (over $1.5 million dollars more than the comparable products procured directly from McAfee). Twynham stated, "…I need to sit down with you and explain what ServiceMesh need from a rev[enue] rec[ognition] perspective and work through those numbers…"

25. On December 16, 2013, Twynham sent an email to Waldron indicating that Marcus Nicholson, a CBA employee who was tasked to review the CBA-McAfee contract, had raised several objections to various points. Waldron forwarded the message to Hunter. The same day, Hunter sent a message to Waldron instructing Waldron to engage with Nicholson's supervisor and let the supervisor know that Waldron needed the supervisor to step in "ASAP." The supervisor responded promptly, raising his own concerns regarding a deal that "came out of the blue" under a "challenging timeframe." The supervisor further outlined the various deal reviews that were underway, including pricing ("…need to confirm that this is a better deal than the one we already had from McAfee themselves…initial calcs were that this

was not a good deal"), legal ("just started the legal review today") and risk ("engaged today").

26. On December 16, 2013, a CBA risk manager sent an email that a risk assessment for the CBA-McAfee deal would take more than one day, to which Waldron replied, "…both Keith and I want this deal done ASAP. Within the next 48hrs max…we're just buying software! … Why are we even doing a risk assessment?"

27. On December 17, 2013, Nicholson asked Twynham for a break-out of the revenue for McAfee products versus ServiceMesh products "in order to valid [sic] this deal as making commercial sense." Waldron, who was copied on the correspondence, replied, "Commercial sense has already been verified…Keith and I want this sorted ASAP - within the next 48 hrs."

28. On December 20, 2013, as both CBA and ServiceMesh staff were trying to get appropriate approvals for the deal, Waldron sent an email to Hunter which provided, "I am in Santa Monica office with Eric [Pulier]…Eric has had the same fun and games with CSC lawyers as we have had. Amusing to see Eric in the midst of it." Later that day, Waldron sent an email to Pulier which provided, "I think we may have just about pulled this one off!! Hopefully later this evening we can raise a glass to another deal done." Pulier responded, "Awesome!!!"

29. On December 21, 2013, Waldron exchanged several emails with his wife in which he detailed the recently signed CBA-McAfee deal that he valued at $11.5 million. As they discussed personal financial issues, Waldron told his wife that Waldron was on the way to the airport soon and "By the way, confirmed: $1.5m."

30. Additional emails demonstrate the collective effort by Waldron, Hunter, Twynham and Pulier to consummate additional contracts between CBA and ServiceMesh before the end of the Earnout Period.

31. On January 6, 2014, Twynham sent Waldron draft contracts between CBA and ServiceMesh for several other software projects that Waldron "had discussed with Eric." The same day, Waldron sent an email to Hunter stating, "I hear Eric has been calling you…he's getting nervous about the remaining TDs [contracts]." Hunter replied, "Yes we caught up today…let's try to get them signed off this week."

32. On January 25, 2014, Hunter received an email from his subordinate with nine contracts between CBA and ServiceMesh for additional software projects "broken down as discussed." The contracts totaled $6.9 million, but separately they fell within Hunter's financial delegation and did not require additional management approvals. Hunter replied, "Perfect let them fly."

33. On January 29, 2014, two days before the Earnout Period ended, Twynham sent an email to Waldron stating, "For Rev[enue] Rec[ognition] purposes contractually I need to get a software acceptance email from you…can we discuss the best way to get this done?"

34. On January 30, 2014, attached to an email courtesy copied to executives at CSC, Pulier provided CSC with a Letter of Representation in which he certified to CSC that for all post-acquisition revenue earned by ServiceMesh from November 15, 2013 through January 31, 2014, ServiceMesh (a) provided CSC with complete customer contract files and all supporting

documentation, (b) accurately and completely responded to all queries by CSC in its review of the post-acquisition revenue, and (c) did not enter into any side agreements in connection with ServiceMesh sales agreements with customers in relation to the Earnout period transactions.

### Earnout Payment

35. Continental Stock Transfer and Trust, based in New York, New York, was the Exchange Agent that administered payments due under the Purchase Agreement from CSC to ServiceMesh's shareholders, and used an account at JP Morgan Chase Bank for this purpose ("Exchange Agent Account").

36. Based on the representations from Pulier and ServiceMesh that it legitimately exceeded the Earnout Amount revenue floor, CSC disbursed $98,034,058.00 to the Exchange Agent Account on March 14, 2014. But for these representations, CSC would not have paid the Earnout Amount.

37. Over the next several days, nearly all of the $98,034,058.00 was transferred from the Exchange Agent Account to the shareholders of ServiceMesh, including Pulier, Twynham, Gyllstrom and TechAdvisors LLC.

### Covert Discussions and Payments

38. On March 19, 2014, approximately $5.6 million was transferred from the Exchange Agent Account to an account in the name of TechAdvisors LLC at Citibank ("Citi-Tech"). Pulier is the sole signatory to this account. On a form for TechAdvisors filed on January 17, 2013, with the State of California, Pulier signed as the entity's CEO.

39. On April 2, 2014, in response to Hunter's inquiry regarding possible employment with CSC, Twynham stated in an email, "The only thing Eric has to say on the topic is that he is absolutely keen to do it but is concerned CSC just would not have the comp plan that would get you here. I told Eric that you were more of the view that, that did not matter so much as you where [sic] confident that Eric would take care of you on the back end…"

40. On April 9, 2014, Gyllstrom sent an email to Pulier at his ServiceMesh account, stating, "Hoping to get the opportunity to make the rest of the million dollars we discussed." Pulier replied, "let's get on the phone and talk about where we are with the earn-out and how to get to the next stages." The same day, Pulier received a report from a ServiceMesh subordinate indicating that Gyllstrom had received approximately $700,000 due to his ownership stake in ServiceMesh.

41. On April 12, 2014, Waldron sent a text message to Twynham that stated, "$$ landed. Keith disappointed." Twynham responded, "Not good. Did Keith get some time with him." Waldron responded: "Yes. Keith (Hunter) at $750K. But to be fair to Eric, it is actually more than the formula. He was just hoping Eric would top it up to $1m." Twynham replied, "$750k is a lot of money!" Later the same day, Twynham sent a text message to Hunter asking if he had been able to spend some time with Pulier. Hunter responded, "Not really going to have a call." Hunter encouraged them to stay in touch, but admonished Twynham, "Use gmail."

1   42.  On July 1, 2014, Twynham sent a text to Hunter, "Eric has committed political suicide and is inadvertently selling us all down the river."  Hunter again instructed Twynham to send "an email update to gmail."

43.  Between June 25 and September 19, 2014, over $4.7 million was transferred from the Citi-Tech account to an account at Citibank in the name of Ace ("Citi-Ace").  Goldstein is the sole signatory to this account.

44.  On December 12, 2014, Waldron sent an instant message to Hunter, which included the following: "…EP [Pulier] wants to send us more money via ACE.  So he can clear it out before EOY [end of year] and avoid tax.  Told him I'll hold it ransom until we all land happily. Lol."  Hunter replied: "Lets meet up in am."

45.  The table below summarizes the total payments received through the transactions described above:

| Recipient | Earnout | Ace | Total |
|---|---|---|---|
| Pulier | $25,584,634 | N/A | $25,584,634 |
| Waldron | N/A | $1,800,000 | $1,800,000 |
| Twynham | $935,539 | N/A | $935,539 |
| Hunter | N/A | $630,040 | $630,040 |
| Gyllstrom | $286,651 | $203,647[1] | $490,299 |

CBA and CSC Investigations

---

[1] On January 21, 2015, after the CBA investigation was known to Waldron, Hunter, Pulier and others, Gyllstrom sent a wire to Ace for the full amount of its prior payment to him.

13

46.     In October 2014, CBA became aware that Waldron and Hunter had received anomalous amounts of U.S. dollar transfers into their CBA bank accounts from accounts held by Ace and Goldstein.

47.     On December 17, 2014, CBA investigators conducted interviews of both Waldron and Hunter. Prior to these interviews, Waldron and Hunter communicated via their personal email accounts. Hunter told Waldron, "I am so shocked I want to vomit. I can not believe we were Tis [sic] stupid." He continued, "List direct answer What we know. We share no more then [sic] we have to nothing besides that…"

48.     When confronted with these transfers, Waldron and Hunter provided conflicting explanations for the payments. Hunter subsequently provided purported evidence in the form of invoices to Ace for work that he had done. A forensic analysis of the documents by Ernst & Young, Australia, determined that the invoices had been created with a version of software not available as of the date of the invoices. Hunter subsequently confessed to fabricating the invoices.

49.     On December 24, 2014, CBA terminated the employment of both Waldron and Hunter.

50.     On January 3, 2015, the former chief information officer of CBA, now in the same role at another bank, contacted Pulier after hearing about allegations of improper payments by ServiceMesh affiliates to recently-terminated CBA employees. Pulier responded that the allegations were "entirely untrue." The following day, Pulier sent a second email stating, "Now that I have had the opportunity to gather information into the actual

14

focus of the inquiry, I am confident this will be concluded soon to everyone's satisfaction."

51. On January 5, 2015, Pulier sent an email to the private emails of Waldron and Hunter requesting that they return all funds to Ace. Although aware that both had already been terminated by CBA, Pulier justified the severing of their relationship because "proceeding now is not viable if CBA support was not in place as understood."

52. CBA determined that the value of the products and services provided by ServiceMesh to CBA in the contracts described was inflated by approximately 65 percent.

53. On March 31, 2015, CSC suspended Pulier while it conducted an internal investigation into his actions. On April 23, 2015, Pulier resigned from CSC. CSC has claimed that Pulier resigned after refusing to cooperate with the internal investigation.

54. Twynham was initially cooperative with CSC's internal investigation, but departed the United States to Australia on June 1, 2015, without notice. In or about July 2015, CSC notified Twynham of its intent to terminate his employment for failure to cooperate with their investigation.

### TRACING OF THE ILLEGALLY DERIVED FUNDS

55. On March 17, 2014, $935,539.02 was wire transferred from the Exchange Agent Account to Twynham's Bank of America Account. On April 11, 2014, Twynham acquired the defendant real property for $1,730,000.00, with a down payment of approximately $700,000.00 and a loan with Premier American Credit Union of $1,038,000.00. The majority of the down payment was paid via a

1  wire transfer from Twynham's Bank of America account. On April
2  22, 2014, a cashier's check in the amount of $135,395.96 was
3  drawn on Twynham's Bank of America account and deposited into
4  Twynham's Premier America Credit Union account number
5  XXXXXX5967. The defendant bank funds represent the remainder of
6  the illegally derived funds remaining in Twynham's Premier
7  America Credit Union account number XXXXXX5967 as of September
8  2, 2015.
9       56.  Based on the above, plaintiff alleges that the
10 defendant real property and defendant bank funds represent or
11 are traceable to proceeds of one or more violations of 18 U.S.C.
12 § 1343 (wire fraud), a specified unlawful activity as defined in
13 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B). The defendant real
14 property and defendant bank funds are therefore subject to
15 forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). Plaintiff
16 further alleges that the defendant real property constitutes
17 property involved in one or more transactions in violation of 18
18 U.S.C. § 1957(a), or property traceable to such property, with
19 the specified unlawful activity being one or more violations of
20 18 U.S.C. § 1343. The defendant real property is therefore
21 subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).
22      WHEREFORE, plaintiff United States of America prays:
23      (a)  that due process issue to enforce the forfeiture of
24 the defendant real property and defendant bank funds;
25      (b)  that due notice be given to all interested parties to
26 appear and show cause why forfeiture should not be decreed;
27
28

1    (c) that this Court decree forfeiture of the defendant
2 real property and defendant bank funds to the United States of
3 America for disposition according to law; and
4    (d) for such other and further relief as this Court may
5 deem just and proper, together with the costs and disbursements
6 of this action.

7 DATED: December 14, 2015    EILEEN M. DECKER
                              United States Attorney
                              LAWRENCE S. MIDDLETON
                              Assistant United States Attorney
                              Chief, Criminal Division
                              STEVEN R. WELK
                              Assistant United States Attorney
                              Chief, Asset Forfeiture Section

                              _____
                              JONATHAN GALATZAN
                              Assistant United States Attorney
                              Attorneys for Plaintiff

                              UNITED STATES OF AMERICA

VERIFICATION

I, Elliot Manegold, hereby declare that:

1. I am a Special Agent with the Federal Bureau of Investigation and I am the case agent for the forfeiture matter entitled United States of America v. Real Property Located in Brentwood, California (Twynham), et al.

2. I have read the above Second Amended Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Second Amended Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed December 7, 2015 in Los Angeles, California.

ELLIOT MANEGOLD