EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JONATHAN GALATZAN
Assistant United States Attorney
Asset Forfeiture Section
California Bar No. 190414
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-2727
    Facsimile:  (213) 894-7177
    E-mail: Jonathan.Galatzan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED
CLERK, U.S. DISTRICT COURT

12/17/15

CENTRAL DISTRICT OF CALIFORNIA
BY:      SW         DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CV 15-6794 RGK (AJWx) |
| Plaintiff, | VERIFIED SECOND AMENDED COMPLAINT FOR FORFEITURE |
| vs. | [18 U.S.C. § 981(a)(1)(A) and (C)] |
| REAL PROPERTY LOCATED IN BRENTWOOD, CALIFORNIA (TWYNHAM) AND $13,271.07 SEIZED FROM PREMIER AMERICA CREDIT UNION ACCOUNT NUMBER XXXXXX5967, | [F.B.I.] |
| Defendants. | |
| BRADLEY MARTIN LEWIS TWYNHAM AND MARIEL TWYNHAM, | |
| Titleholders and Claimants. | |

1

For its claims against the defendants $13,271.07 seized from Premier America Credit Union account number XXXXXX5967 and real property located in Brentwood, California, plaintiff United States of America alleges as follows:

JURISDICTION AND VENUE

1.    This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(C).

2.    This court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3.    Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

PERSONS AND ENTITIES

4.    The plaintiff is the United States of America.

5.    The defendants are $13,271.07 seized on September 2, 2015 pursuant to a federal seizure warrant from account number XXXXXX5967 at Premier America Credit Union, 19867 Prairie Street, Chatsworth, California (the "defendant bank funds"), and real property located in Brentwood, California (the "defendant real property"), titled in the name of Bradley Martin Lewis Twynham and Mariel Twynham, husband and wife as community property, with Assessor's Parcel Number 4265-011-111, and more particularly described as follows:

> Parcel 1:
> An undivided 1/8th interest in and to Lot 1 of Tract No. 52696, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 1258, Pages 87 and 88 of Maps, in the Office of the County Recorder of said County.  Except therefrom Units 1 through 8 inclusive, as shown and defined upon the Condominium Plan recorded December 14, 2001 as

2

Instrument No. 01-2395089, Official Records of said
County.  Excepting therefrom the exclusive use common
area easements for balcony area, deck/roof area, and
parking area designated as "B", "D", "R" and "P", in,·
over, across and through those portions of the common
area as shown on the above referred to Condominium
Plan.

Parcel 2:
Unit 8 as shown and defined upon the Condominium Plan
referred to in Parcel 1 above.

Parcel 3:
An exclusive use common area easement for all uses and
purposes of a balcony area, deck/roof area and parking
area to be appurtenant to Parcels 1 and 2 above, in,
over, across and through that portion of the "Common
Area" designated and delineated as "B", "D", "R" and
"P" which bear the same number as the unit referred to
in Parcel 2 above, followed by the letters "B", "D",
"R" and "P" on the above referenced Condominium Plan.

6.    A grant deed dated March 24, 2014, and recorded with
the County Recorder on April 11, 2014, as Instrument No.
20140369221 shows title to the defendant real property is
currently held in the name of "Bradley Martin Lewis Twynham and
Mariel Twynham, husband and wife, as community property with
Right of Survivorship."  According to a title report issued by
Title 365 with an effective date of July 16, 2015, there is a
deed of trust against the defendant real property to secure an
indebtedness in the amount of $1,038,000.00 recorded on April 7,
2014, as Instrument No. 20140369222, in favor of Premier America
Credit Union.  The government does not seek to forfeit the
interests of Premier America Credit Union in the defendant real
property.

1      7.    The interests of Bradley Martin Lewis Twynham, Mariel
2  Twynham, and Computer Sciences Corporation may be adversely
3  affected by these proceedings.

4      8.    The defendant bank funds are in the custody of the
5  United States Marshals Service in this district, where they
6  shall remain subject to this court's jurisdiction during the
7  pendency of this action.

8                    EVIDENCE SUPPORTING FORFEITURE

9      9.    Between at least October 2013 and the present, certain
10  shareholders of ServiceMesh, Inc. of Santa Monica, California
11  ("ServiceMesh"), engaged in a scheme to fraudulently inflate the
12  revenue of ServiceMesh in order to generate unwarranted,
13  incentive-based compensation for ServiceMesh shareholders and
14  generate bribes and kickbacks to their accomplices.  The result
15  of this scheme was that the publicly traded company (Computer
16  Sciences Corporation) that acquired ServiceMesh in October 2013
17  overpaid a variable incentive payment to ServiceMesh and its
18  shareholders by approximately $98 million.

19              The Principals

20      10.   Eric Pulier ("Pulier") was the founder and, through
21  affiliated entities, approximately 30% owner of ServiceMesh, an
22  information technology ("IT") services company based in Santa
23  Monica, California.  Pulier was also the founder and owner of
24  TechAdvisors LLC, a Delaware corporation.

25      11.   Andrew Goldstein ("Goldstein") was Pulier's longtime
26  friend and the control person for Ace Inc., aka Ace Foundation
27  ("Ace"), a purported non-profit entity incorporated in Delaware.
28  On an IRS Form W-9 completed by Goldstein for Ace on May 30,

                                4

2014, Ace's address was initially listed as ServiceMesh's corporate headquarters in Santa Monica, California.  This was subsequently crossed-out and replaced with Goldstein's residence in Beverly Hills, California.  On or about January 14, 2015, after the commencement of investigations by both Australian criminal authorities and Computer Sciences Corporation ("CSC"), Ace changed its name from Ace Inc. to Ace Foundation.

12.  Jon Waldron ("Waldron") and his supervisor, Keith Hunter ("Hunter"), were IT executives at Commonwealth Bank of Australia ("CBA"), the largest publicly-traded company in Australia.  Hans Gyllstrom ("Gyllstrom") was an IT consultant to CBA since 2007.

13.  Bradley Martin Lewis Twynham ("Twynham") was a ServiceMesh employee based in Australia and, later, California, who helped manage the relationship with CBA.

14.  CSC is a New York Stock Exchange listed company, headquartered in Falls Church, Virginia, and also involved in IT services.

                    The Contract

15.  Pursuant to an agreement entered into on October 29, 2013 and amended on November 15, 2013, CSC agreed to acquire all of ServiceMesh's outstanding stock for a fixed cash amount at closing plus a variable incentive payment ("Earnout Amount") based on ServiceMesh's revenues between January 1, 2013 and January 31, 2014 ("Earnout Period").  For every $1 in ServiceMesh revenue generated during the Earnout Period in excess of a $20 million floor, ServiceMesh shareholders would

1   collectively receive approximately $10.15 in Earnout Amount, up
2   to a maximum of approximately $137 million.

3        16.   In February 2014, CSC calculated that ServiceMesh had
4   generated approximately $29.7 million in revenue creditable
5   toward the Earnout Amount, including approximately $10.4 million
6   attributable to CBA.  As a result of generating approximately
7   $9.7 million in revenue in excess of the floor, ServiceMesh
8   shareholders were credited an Earnout Amount of approximately
9   $98 million.  Without the revenue attributable to CBA,
10  ServiceMesh shareholders would not have received any Earnout
11  Amount.

12            The ServiceMesh/CBA Relationship
13       17.   ServiceMesh began providing IT services to CBA in
14  2009.  Waldron, with direction from Pulier, actively lobbied CBA
15  to hire Hunter as Waldron's supervisor at CBA and encouraged
16  Hunter to accept the position.  On April 10, 2010, Pulier sent
17  an email to Waldron regarding an upcoming dinner hosted by
18  ServiceMesh for Hunter.  Pulier said, "The purpose of getting
19  Keith [Hunter] with you earlier (before he gets the job) is to
20  establish you as the go-to guy…leave him with a few take-aways:
21  he wants the job, he is not in it alone, there are people at the
22  bank that he can rely upon and trust."

23       18.   On July 27, 2011, Hunter's first day of employment at
24  CBA, Pulier sent an email to Hunter profiling several CBA
25  executives and projects, concluding with, "We have your back on
26  every level."

27       19.   Pulier, Waldron, Twynham and Gyllstrom had a
28  longstanding social connection.  In a July 2010 email, Twynham

1   informed Pulier that Waldron had been advised by a senior CBA
2   executive not to personally approve travel for Twynham and
3   Pulier as "it would be a conflict of interest" and mentioned
4   Waldron's "birthday bash in Canne [sic] as evidence of hos [sic]
5   friendship with you."  In addition, Waldron invited Gyllstrom
6   and Pulier to an April 2011 bachelor party for Twynham in
7   Sydney, Australia.  Twynham was best man in Waldron's 2012
8   wedding, to which Pulier was invited.

9      20.  On May 24, 2011, Waldron sent an email to Pulier and
10   Twynham that provided, "Where the money goes…(confidential of
11   course)."  Attached to the email was a document labeled as
12   confidential and containing CBA's budgeted IT spending for 2011
13   and 2012.

14      21.  The following emails demonstrate efforts by Waldron
15   and Hunter to expedite the consummation of a deal whereby CBA
16   would purchase security technology products by McAfee, Inc.
17   ("McAfee") from ServiceMesh (the "CBA-McAfee" transactions)
18   rather than continuing to procure them directly from McAfee or
19   via equipment purchased from another vendor that included McAfee
20   products.

21      22.  On October 31, 2013, the day after the CSC acquisition
22   of ServiceMesh was announced, a CBA colleague sent an email to
23   Waldron responding to his inquiry about the current McAfee
24   relationship, stating that it generated $2.4 million per year in
25   business between CBA and McAfee.  Later that day, Waldron
26   forwarded that email to Hunter with his own message, "This is
27   what I'm aiming to get thru on SM [ServiceMesh] paper.  Have
28   checked, and since the licenses are perpetual the full amount

1  qualifies as in-year revenue.  So here's $7m for them.  It's now
2  with Brad [Twynham] and Eric [Pulier] to sign up a partner
3  agreement with McAfee."

4       23.  On November 2, 2013, Twynham sent an email to Waldron
5  asking if Waldron had "been able to find me a contact at McAfee
6  to talk with?"  Waldron forwarded the email to a CBA colleague,
7  who at the instruction of Waldron sent directly to Twynham the
8  contact information for CBA's relationship manager at McAfee.

9       24.  On December 9, 2013, Twynham sent an email to Waldron
10 indicating that ServiceMesh's proposal for the CBA-McAfee deal
11 would be $8.8 million for three years (over $1.5 million dollars
12 more than the comparable products procured directly from
13 McAfee).  Twynham stated, "…I need to sit down with you and
14 explain what ServiceMesh need from a rev[enue] rec[ognition]
15 perspective and work through those numbers…"

16      25.  On December 16, 2013, Twynham sent an email to Waldron
17 indicating that Marcus Nicholson, a CBA employee who was tasked
18 to review the CBA-McAfee contract, had raised several objections
19 to various points.  Waldron forwarded the message to Hunter.
20 The same day, Hunter sent a message to Waldron instructing
21 Waldron to engage with Nicholson's supervisor and let the
22 supervisor know that Waldron needed the supervisor to step in
23 "ASAP."  The supervisor responded promptly, raising his own
24 concerns regarding a deal that "came out of the blue" under a
25 "challenging timeframe."  The supervisor further outlined the
26 various deal reviews that were underway, including pricing
27 ("…need to confirm that this is a better deal than the one we
28 already had from McAfee themselves…initial calcs were that this

1   was not a good deal"), legal ("just started the legal review

2   today") and risk ("engaged today").

3       26.   On December 16, 2013, a CBA risk manager sent an email

4   that a risk assessment for the CBA-McAfee deal would take more

5   than one day, to which Waldron replied, "…both Keith and I want

6   this deal done ASAP. Within the next 48hrs max…we're just buying

7   software! … Why are we even doing a risk assessment?"

8       27.   On December 17, 2013, Nicholson asked Twynham for a

9   break-out of the revenue for McAfee products versus ServiceMesh

10   products "in order to valid [sic] this deal as making commercial

11   sense."  Waldron, who was copied on the correspondence, replied,

12   "Commercial sense has already been verified…Keith and I want

13   this sorted ASAP - within the next 48 hrs."

14       28.   On December 20, 2013, as both CBA and ServiceMesh

15   staff were trying to get appropriate approvals for the deal,

16   Waldron sent an email to Hunter which provided, "I am in Santa

17   Monica office with Eric [Pulier]…Eric has had the same fun and

18   games with CSC lawyers as we have had. Amusing to see Eric in

19   the midst of it."  Later that day, Waldron sent an email to

20   Pulier which provided, "I think we may have just about pulled

21   this one off!! Hopefully later this evening we can raise a glass

22   to another deal done."  Pulier responded, "Awesome!!!"

23       29.   On December 21, 2013, Waldron exchanged several emails

24   with his wife in which he detailed the recently signed CBA-

25   McAfee deal that he valued at $11.5 million.  As they discussed

26   personal financial issues, Waldron told his wife that Waldron

27   was on the way to the airport soon and "By the way, confirmed:

28   $1.5m."

1   30.   Additional emails demonstrate the collective effort by
2   Waldron, Hunter, Twynham and Pulier to consummate additional
3   contracts between CBA and ServiceMesh before the end of the
4   Earnout Period.

5   31.   On January 6, 2014, Twynham sent Waldron draft
6   contracts between CBA and ServiceMesh for several other software
7   projects that Waldron "had discussed with Eric."  The same day,
8   Waldron sent an email to Hunter stating, "I hear Eric has been
9   calling you…he's getting nervous about the remaining TDs
10  [contracts]."  Hunter replied, "Yes we caught up today…let's try
11  to get them signed off this week."

12  32.   On January 25, 2014, Hunter received an email from his
13  subordinate with nine contracts between CBA and ServiceMesh for
14  additional software projects "broken down as discussed."  The
15  contracts totaled $6.9 million, but separately they fell within
16  Hunter's financial delegation and did not require additional
17  management approvals.  Hunter replied, "Perfect let them fly."

18  33.   On January 29, 2014, two days before the Earnout
19  Period ended, Twynham sent an email to Waldron stating, "For
20  Rev[enue] Rec[ognition] purposes contractually I need to get a
21  software acceptance email from you…can we discuss the best way
22  to get this done?"

23  34.   On January 30, 2014, attached to an email courtesy
24  copied to executives at CSC, Pulier provided CSC with a Letter
25  of Representation in which he certified to CSC that for all
26  post-acquisition revenue earned by ServiceMesh from November 15,
27  2013 through January 31, 2014, ServiceMesh (a) provided CSC with
28  complete customer contract files and all supporting

1   documentation, (b) accurately and completely responded to all
2   queries by CSC in its review of the post-acquisition revenue,
3   and (c) did not enter into any side agreements in connection
4   with ServiceMesh sales agreements with customers in relation to
5   the Earnout period transactions.

6              Earnout Payment

7        35.   Continental Stock Transfer and Trust, based in New
8   York, New York, was the Exchange Agent that administered
9   payments due under the Purchase Agreement from CSC to
10  ServiceMesh's shareholders, and used an account at JP Morgan
11  Chase Bank for this purpose ("Exchange Agent Account").

12       36.   Based on the representations from Pulier and
13  ServiceMesh that it legitimately exceeded the Earnout Amount
14  revenue floor, CSC disbursed $98,034,058.00 to the Exchange
15  Agent Account on March 14, 2014.  But for these representations,
16  CSC would not have paid the Earnout Amount.

17       37.   Over the next several days, nearly all of the
18  $98,034,058.00 was transferred from the Exchange Agent Account
19  to the shareholders of ServiceMesh, including Pulier, Twynham,
20  Gyllstrom and TechAdvisors LLC.

21              Covert Discussions and Payments

22       38.   On March 19, 2014, approximately $5.6 million was
23  transferred from the Exchange Agent Account to an account in the
24  name of TechAdvisors LLC at Citibank ("Citi-Tech").  Pulier is
25  the sole signatory to this account.  On a form for TechAdvisors
26  filed on January 17, 2013, with the State of California, Pulier
27  signed as the entity's CEO.

28

1     39.   On April 2, 2014, in response to Hunter's inquiry
2  regarding possible employment with CSC, Twynham stated in an
3  email, "The only thing Eric has to say on the topic is that he
4  is absolutely keen to do it but is concerned CSC just would not
5  have the comp plan that would get you here.  I told Eric that
6  you were more of the view that, that did not matter so much as
7  you where [sic] confident that Eric would take care of you on
8  the back end…"

9     40.   On April 9, 2014, Gyllstrom sent an email to Pulier at
10 his ServiceMesh account, stating, "Hoping to get the opportunity
11 to make the rest of the million dollars we discussed."  Pulier
12 replied, "let's get on the phone and talk about where we are
13 with the earn-out and how to get to the next stages."  The same
14 day, Pulier received a report from a ServiceMesh subordinate
15 indicating that Gyllstrom had received approximately $700,000
16 due to his ownership stake in ServiceMesh.

17    41.   On April 12, 2014, Waldron sent a text message to
18 Twynham that stated, "$$ landed.  Keith disappointed."  Twynham
19 responded, "Not good.  Did Keith get some time with him."
20 Waldron responded: "Yes.  Keith (Hunter) at $750K.  But to be
21 fair to Eric, it is actually more than the formula.  He was just
22 hoping Eric would top it up to $1m."  Twynham replied, "$750k is
23 a lot of money!" Later the same day, Twynham sent a text message
24 to Hunter asking if he had been able to spend some time with
25 Pulier.  Hunter responded, "Not really going to have a call."
26 Hunter encouraged them to stay in touch, but admonished Twynham,
27 "Use gmail."

28

42. On July 1, 2014, Twynham sent a text to Hunter, "Eric has committed political suicide and is inadvertently selling us all down the river." Hunter again instructed Twynham to send "an email update to gmail."

43. Between June 25 and September 19, 2014, over $4.7 million was transferred from the Citi-Tech account to an account at Citibank in the name of Ace ("Citi-Ace"). Goldstein is the sole signatory to this account.

44. On December 12, 2014, Waldron sent an instant message to Hunter, which included the following: "…EP [Pulier] wants to send us more money via ACE. So he can clear it out before EOY [end of year] and avoid tax. Told him I'll hold it ransom until we all land happily. Lol." Hunter replied: "Lets meet up in am."

45. The table below summarizes the total payments received through the transactions described above:

| Recipient | Earnout | Ace | Total |
|-----------|---------|-----|-------|
| Pulier | $25,584,634 | N/A | $25,584,634 |
| Waldron | N/A | $1,800,000 | $1,800,000 |
| Twynham | $935,539 | N/A | $935,539 |
| Hunter | N/A | $630,040 | $630,040 |
| Gyllstrom | $286,651 | $203,647[1] | $490,299 |

CBA and CSC Investigations

---

[1] On January 21, 2015, after the CBA investigation was known to Waldron, Hunter, Pulier and others, Gyllstrom sent a wire to Ace for the full amount of its prior payment to him.

1    46.  In October 2014, CBA became aware that Waldron and
2  Hunter had received anomalous amounts of U.S. dollar transfers
3  into their CBA bank accounts from accounts held by Ace and
4  Goldstein.
5    47.  On December 17, 2014, CBA investigators conducted
6  interviews of both Waldron and Hunter.  Prior to these
7  interviews, Waldron and Hunter communicated via their personal
8  email accounts.  Hunter told Waldron, "I am so shocked I want to
9  vomit. I can not believe we were Tis [sic] stupid."  He
10  continued, "List direct answer What we know.  We share no more
11  then [sic] we have to nothing besides that…"
12    48.  When confronted with these transfers, Waldron and
13  Hunter provided conflicting explanations for the payments.
14  Hunter subsequently provided purported evidence in the form of
15  invoices to Ace for work that he had done.  A forensic analysis
16  of the documents by Ernst & Young, Australia, determined that
17  the invoices had been created with a version of software not
18  available as of the date of the invoices.  Hunter subsequently
19  confessed to fabricating the invoices.
20    49.  On December 24, 2014, CBA terminated the employment of
21  both Waldron and Hunter.
22    50.  On January 3, 2015, the former chief information
23  officer of CBA, now in the same role at another bank, contacted
24  Pulier after hearing about allegations of improper payments by
25  ServiceMesh affiliates to recently-terminated CBA employees.
26  Pulier responded that the allegations were "entirely untrue."
27  The following day, Pulier sent a second email stating, "Now that
28  I have had the opportunity to gather information into the actual

1  focus of the inquiry, I am confident this will be concluded soon
2  to everyone's satisfaction."

3       51.  On January 5, 2015, Pulier sent an email to the
4  private emails of Waldron and Hunter requesting that they return
5  all funds to Ace.  Although aware that both had already been
6  terminated by CBA, Pulier justified the severing of their
7  relationship because "proceeding now is not viable if CBA
8  support was not in place as understood."

9       52.  CBA determined that the value of the products and
10  services provided by ServiceMesh to CBA in the contracts
11  described was inflated by approximately 65 percent.

12       53.  On March 31, 2015, CSC suspended Pulier while it
13  conducted an internal investigation into his actions.  On April
14  23, 2015, Pulier resigned from CSC.  CSC has claimed that Pulier
15  resigned after refusing to cooperate with the internal
16  investigation.

17       54.  Twynham was initially cooperative with CSC's internal
18  investigation, but departed the United States to Australia on
19  June 1, 2015, without notice.  In or about July 2015, CSC
20  notified Twynham of its intent to terminate his employment for
21  failure to cooperate with their investigation.

22            TRACING OF THE ILLEGALLY DERIVED FUNDS

23       55.  On March 17, 2014, $935,539.02 was wire transferred
24  from the Exchange Agent Account to Twynham's Bank of America
25  Account.  On April 11, 2014, Twynham acquired the defendant real
26  property for $1,730,000.00, with a down payment of approximately
27  $700,000.00 and a loan with Premier American Credit Union of
28  $1,038,000.00.  The majority of the down payment was paid via a

wire transfer from Twynham's Bank of America account.  On April 22, 2014, a cashier's check in the amount of $135,395.96 was drawn on Twynham's Bank of America account and deposited into Twynham's Premier America Credit Union account number XXXXXX5967.  The defendant bank funds represent the remainder of the illegally derived funds remaining in Twynham's Premier America Credit Union account number XXXXXX5967 as of September 2, 2015.

56.  Based on the above, plaintiff alleges that the defendant real property and defendant bank funds represent or are traceable to proceeds of one or more violations of 18 U.S.C. § 1343 (wire fraud), a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B).  The defendant real property and defendant bank funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).  Plaintiff further alleges that the defendant real property constitutes property involved in one or more transactions in violation of 18 U.S.C. § 1957(a), or property traceable to such property, with the specified unlawful activity being one or more violations of 18 U.S.C. § 1343.  The defendant real property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays:

(a)  that due process issue to enforce the forfeiture of the defendant real property and defendant bank funds;

(b)  that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

1        (c)  that this Court decree forfeiture of the defendant

2   real property and defendant bank funds to the United States of

3   America for disposition according to law; and

4        (d)  for such other and further relief as this Court may

5   deem just and proper, together with the costs and disbursements

6   of this action.

7   DATED: December 14, 2015        EILEEN M. DECKER
                                    United States Attorney
8                                   LAWRENCE S. MIDDLETON
9                                   Assistant United States Attorney
                                    Chief, Criminal Division
10                                  STEVEN R. WELK
                                    Assistant United States Attorney
11                                  Chief, Asset Forfeiture Section

12

13                                  JONATHAN GALATZAN
14                                  Assistant United States Attorney
                                    Attorneys for Plaintiff
15
                                    UNITED STATES OF AMERICA
16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>VERIFICATION</u>

2      I, Elliot Manegold, hereby declare that:

3      1.     I am a Special Agent with the Federal Bureau of

4  Investigation and I am the case agent for the forfeiture matter

5  entitled <u>United States of America v. Real Property Located in</u>

6  <u>Brentwood, California (Twynham), et al</u>.

7      2.     I have read the above Second Amended Verified

8  Complaint for Forfeiture and know its contents.  It is based

9  upon my own personal knowledge and reports provided to me by

10  other law enforcement agents.

11      3.     Everything contained in the Second Amended Complaint

12  is true and correct, to the best of my knowledge and belief.

13      I declare under penalty of perjury that the foregoing is

14  true and correct.

15      Executed December 7 , 2015 in Los Angeles, California.

16

17                                ELLIOT MANEGOLD

18

19

20

21

22

23

24

25

26

27

28