Jeffrey B. Isaacs, Esq., SBN 117104
William L. Seldeen, Esq. SBN 222388
Oren Rosenthal, Esq., SBN 243110
**ISAACS | FRIEDBERG LLP**
555 South Flower Street, Suite 4250
Los Angeles, California 90071
Telephone: (213) 929-5550/Facsimile: (213) 955-5794
Email: jisaacs@ifcounsel.com
　　　　wseldeen@ifcounsel.com
　　　　orosenthal@ifcounsel.com

David A. Kettel, Esq., SBN 125745
**THEODORA ORINGHER PC**
1840 Century Park East, Suite 500
Los Angeles, California 90067-2120
Telephone: (310) 557-2009/Facsimile: (310) 551-0283
Email: dkettel@tocounsel.com

Attorneys for Claimants
Bradley Twynham and Mariel Twynham

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>REAL PROPERTY LOCATED IN BRENTWOOD, CALIFORNIA (TWYNHAM) and $13,271.07 SEIZED FROM PREMIER AMERICA CREDIT UNION ACCOUNT NUMBER XXXXXX5967,<br><br>　　　　Defendants.<br><br>BRADLEY MARTIN LEWIS TWYNHAM AND MARIEL TWYNHAM,<br><br>　　　　Titleholders and Claimants. | Case No. CV 15-6794-RGK-AJW<br><br>Hon. R. Gary Klausner<br><br>**CLAIMANTS MARIEL TWYNHAM AND BRADLEY TWYNHAM'S OPPOSITION TO THE UNITED STATES OF AMERICA'S *EX PARTE* APPLICATION FOR ORDER STAYING DISCOVERY**<br><br>Action Filed:　　Sep. 2, 2015<br>FAC Filed:　　　Nov. 23, 2015<br>SAC Filed:　　　Dec. 14, 2015<br>Discovery Cut-off: Jul. 12, 2016<br>Trial Date:　　　Oct. 11, 2016 |

**OPPOSITION TO *EX PARTE* APPLICATION TO STAY DISCOVERY**

189044.1

Claimants Bradley Twynham and Mariel Twynham ("Claimants" or the "Twynhams") hereby oppose the government's Ex Parte Application for Order Staying Discovery Until the Court Rules on Plaintiff's Motion to Stay the Civil Forfeiture Proceeding ("*Ex Parte* Application").

## I.   INTRODUCTION.

Bradley Twynham and his wife Mariel Twynham are Australian citizens who previously resided in Los Angeles. Without any allegations that the Twynhams did anything wrong, the government has seized $13,271 of their personal savings and seeks to forfeit their condominium in Brentwood, which is their home and principal marital asset.[1] The Twynham's home was purchased with funds Mr. Twynham received from Computer Sciences Corporation ("CSC") in return for his shares in ServiceMesh, Inc. ("ServiceMesh"), a company for which he had worked as an information technology consultant. He was one of 170 ServiceMesh shareholders whose shares were acquired by CSC in its November 2013 acquisition of ServiceMesh. He is the only ServiceMesh shareholder, however, whose money and property the government has sought to forfeit.

At approximately 4:00 p.m. yesterday, the government served Claimants with an *Ex Parte* Application to stay discovery in this six-month old proceeding. Claimants oppose the government's Application on the following grounds:

---

[1] Mr. Twynham is not a defendant in any criminal case, nor is he the target of any criminal investigation. He is not alleged to have personally made any false statements, to have aided and abetted the making of any false statements or to have had knowledge of any false statement; nor is he alleged to have made any bribes, kickbacks or other illicit payments or to have aided and abetted the making of any such payments. *See* Dkt. 30 (SAC). Rather, he is alleged to have done nothing more than perform his job, which was the negotiation of contracts with CBA – contracts which CBA's own chief information officer stated to Australian authorities had significant value to CBA. Dkt. 45-4 (Exhibit 13 to the Rosenthal Declaration in Support of Claimants' Motion to Dismiss).

(a) *Ex parte* relief is unwarranted and inappropriate in the circumstances. The government had ample opportunity to file a noticed motion at any time following its initiation of these forfeiture proceedings more than six months ago. The government's *Ex Parte* Application does not explain, much less justify, why the government is moving only now to stay the case: six months after it was filed; after twice obtaining Claimants' stipulation to amend the complaint; after agreeing to discovery cut-off and trial dates; after standing silent at the scheduling conference while this Court entered its scheduling order; and after Claimants filed and the parties fully briefed Claimants' Motion to Dismiss, which is presently under submission; and

(b) The government has not come close to carrying its burden of justifying a stay of discovery, given that Claimants' written discovery requests only seek documents and information directly related to the government's forfeiture claims, and specifically exclude grand jury materials, witness statements and government work product, and their document subpoena to CSC only seeks discovery relating to matters CSC has put at issue in its $100 million lawsuit against Mr. Pulier.

## II.  NATURE OF THE DISPUTE.

CSC is a publicly traded Nevada corporation headquartered in Falls Church, Virginia, which provides information technology ("IT") products and services.

Prior to its acquisition by CSC, ServiceMesh was a privately held Delaware corporation based in Santa Monica, California. It was founded in 2008 by Mr. Pulier, who was its largest shareholder and served as its Chief Executive Officer. Dkt. 45-2; Rosenthal Decl., ¶5; Dkt. 30; SAC, ¶ 10. ServiceMesh provides state of the art "cloud-based" IT products and services to major companies around the world, one of which was Commonwealth Bank of Australia ("CBA"), Australia's largest publicly traded corporation.

In November 2013, CSC agreed to acquire ServiceMesh for (1) a fixed base amount, and (2) a variable incentive amount (the "earnout payment") based on ServiceMesh's revenue between January 1, 2013 and January 31, 2014 (the "earnout

period"). Dkt. 30; SAC, ¶ 25. For every $1.00 in ServiceMesh revenue recognized by CSC above a floor amount of $20 million, CSC would pay ServiceMesh shareholders approximately $10.15, up to a maximum of approximately $137 million. *Id*.

In February 2014, CSC credited ServiceMesh with having generated approximately $29.7 million in recognizable revenue during the earnout period, which resulted in an earnout payment totaling approximately $98 million ($9.7 million over the floor amount x 10.15). Dkt. 30; SAC, ¶ 16. The revenue CSC recognized included revenue from contracts between ServiceMesh and CBA. Dkt. 30; SAC, ¶¶ 21, 30.

The Twynhams were only one of 170 ServiceMesh shareholders who received a portion of the earnout payment in return for selling their ServiceMesh shares to CSC. Dkt. 45-2; Rosenthal Decl. ¶ 35; Ex. 12 (Appendix H). The Twynhams' portion was less than one percent of the earnout payment. Dkt. 30; SAC, ¶¶ 36, 55.

According to the SAC, in early 2015, CSC learned that, months after the distribution of the earnout payment, two CBA IT managers, Keith Hunter and Jon Waldron, had received payments from the Ace Foundation, a non-profit Delaware corporation funded by a company Mr. Pulier controlled named TechAdvisors, LLC. Dkt. 30; SAC, ¶¶ 11, 38, 43.

### III. PROCEDURAL HISTORY.

**A. Relevant Pre-Filing Events.**

In May 2015, CSC brought suit against Mr. Pulier and others in Delaware Chancery Court, seeking to recover the entire $98 million earnout payment. CSC alleged that Mr. Pulier concealed the payments to Hunter and Waldron in breach of contractual, fiduciary and other legal duties to CSC. Dkt. 45-2; Rosenthal Decl. ¶ 31, Ex. 11. Mr. Twynham is not named in that suit. That litigation, which is being vigorously contested, remains in the pleading stage. Dkt. 45-2; Rosenthal Decl. ¶ 30.

In July 2015, just one week after Claimants' counsel met with the Assistant U.S. Attorney ("AUSA") handling the criminal investigation of this matter,

1  Mr. Twynham was notified by CSC that he was being terminated for cause for failing
2  to cooperate in CSC's internal investigation of Mr. Pulier.  Dkt. 45-2, ¶ 6; SAC, ¶ 54.

**B.   The Seizure Warrant and Initial Forfeiture Complaint.**

These civil forfeiture proceedings were initiated more than six months ago on September 2, 2015, when the government sought and obtained a seizure warrant from Magistrate Judge Rozella Oliver to seize Claimants' automobile and $135,000 in savings.  The warrant was based largely on materially false and misleading statements by the case agent, made under oath.  Dkt. 45-2; Rosenthal Decl., ¶ 10.  The warrant was ultimately used to seize $13,271 of the Twynhams' savings on deposit at Premier America Credit Union.  Dkt. 30; SAC, ¶ 5.

On September 2, 2015, the government filed the original forfeiture Complaint, which sought forfeiture of the Twynhams' home in Brentwood.  Dkt. 1.  On the same day, the government recorded a *lis pendens* against the property, preventing the Twynhams from selling it.  Dkt. 8.

**C.   The First and Second Amended Forfeiture Complaints.**

After learning of the government's actions from third parties, Claimants' counsel submitted materials to the AUSA handling the forfeiture case (the "Forfeiture AUSA") demonstrating that a substantial portion of the government's allegations were false or misleading.  Dkt. 45-2; Rosenthal Decl. ¶ 10.  In response, on November 23, 2015, the government filed the First Amended Complaint ("FAC"), which combined the government's request to forfeit the bank funds with its action to forfeit the Twynhams' home.  Dkt. 21.  The FAC also deleted roughly half of the government's previous allegations and revised significantly its forfeiture theory, relying upon allegations lifted directly from CSC's civil lawsuit against Mr. Pulier.  *Id.*; Dkt. 45-2; Rosenthal Decl. ¶ 17.

On December 17, 2015, the government filed a Second Amended Complaint ("SAC"), which sought to correct a number of remaining factual inaccuracies in the FAC.  Dkt. 30.  Following the filing of the SAC, Claimants' counsel met and

1  conferred telephonically with the Forfeiture AUSA, during which he clarified that:
2  (1) the alleged misrepresentations forming the basis of the wire fraud allegations were
3  representations in a January 29, 2014 "Letter of Representation" signed by Mr. Pulier
4  (the "LOR"); (2) the wire transmission is the emailing of the LOR; and (3) the
5  government was not alleging a deprivation of honest services scheme, only a scheme
6  to deprive CSC of the earnout payment.  Dkt. 45-2; Rosenthal Decl., ¶ 17.

7        The Forfeiture AUSA also invited Claimants' counsel to submit in writing their
8  additional requests for clarification, including how the government contends the
9  representations are false, and which specific financial transactions the government
10 contends violated 18 U.S.C. § 1957.  Claimants' counsel did so the next day.  Dkt.45-
11 2; Rosenthal Decl. ¶¶ 18-20.  The government, however, never responded.  *See id.*,
12 ¶ 21.

13 **D.   The Parties' Joint Rule 26(f) Report and the Court's February 1, 2016**
14 **      Scheduling Order.**

15       The parties filed their Rule 26(f) Joint Report on January 25, 2016.  Dkt. 40.  In
16 the Joint Report, both parties indicated that they intend to serve written discovery.
17 *Id.*, p. 6.  Claimants stated that they "anticipate serving written discovery on the
18 government and third party subpoenas on CSC and ServiceMesh, and taking
19 depositions of witnesses, including CSC executives and the case agent who verified
20 the Complaint, FAC and SAC."  *Id.*
21       On February 1, 2016, the Court held the Rule 26 conference.  During the
22 conference, the Court set a trial date of October 11, 2016; a pretrial conference date of
23 September 26, 2016; a discovery cut-off date of July 12, 2016; and a dispositive
24 motion cutoff date of July 26, 2016.  Dkt. 51, pp. 3:13-4:8.  Neither party objected to
25 any of the dates set by the Court.  Further, the Forfeiture AUSA made no mention
26 during the hearing of any intention to seek a stay of discovery or the proceedings.
27 Dkt. 51.  Following the conference, the Court entered a Scheduling Order setting forth
28 the above dates.  Dkt. 43.

**E. Claimants' Motion to Dismiss.**

On February 9, 2016, Claimants filed their Motion to Dismiss the SAC, on the ground that: (1) it fails to properly and sufficiently allege that defendants real property and bank funds are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) as the proceeds of, or traceable to, one or more violations of 18 U.S.C. § 1343 (wire fraud); and (2) it fails to properly and sufficiently allege that defendant real property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) as property traceable to funds involved in one or more violations of 18 U.S.C. § 1957 (transactional money laundering). Dkt. 45.

The government filed its opposition on February 22, 2016. Dkt. 47. Claimants filed their reply on February 29, 2016. Dkt. 48. Thereafter, on March 9, 2016, the Court issued an order taking the motion under submission and vacating the hearing date. Dkt. 53.

**F. Claimants' Discovery Request and Document Subpoena to CSC.**

In an effort to keep with the Scheduling Order's July 12, 2016 discovery cut-off deadlines, on February 17, 2016, Claimants propounded written discovery on the government. Dkt. 56, p. 2. Specifically, Claimants served on the government one set of Requests for Production of Documents, Interrogatories, and Requests for Admissions. *Id*. Claimants have not noticed any depositions. As discussed below, the written discovery requests relate directly to the allegations appearing on the face of the SAC, and expressly exclude grand jury materials, witness statements and government work product.

On February 19, 2016, Claimants served the government with a Notice of Subpoena to CSC. The subpoena's return date is March 14, 2016. The document subpoena served on CSC seeks only documents that relate to the allegations appearing on the face of the SAC, which are the same allegations CSC has put at issue in its lawsuit against Mr. Pulier in Delaware.

**OPPOSITION TO *EX PARTE* APPLICATION TO STAY DISCOVERY**
189044.1

**G.  The Government's *Ex Parte* Application to Stay Discovery.**

On March 9, 2016, at approximately 4:00 p.m., the government filed (1) a Motion to Stay Case Pending Further Order of the Court, with a hearing date of April 11, 2016, Dkt. 54; (2) an Application for Leave for In Camera Review, Dkt. 55; and (3) an *Ex Parte* Application to Stay Discovery pending resolution of the Motions to Stay Case, Dkt. No. 56.  (The Application was deceptively labeled as a "Discovery Matter," apparently in an attempt to have it heard by Magistrate Judge Wistrich, who is unfamiliar with the lengthy history of the case.)

The Application, which is only two and a half pages in length, does not set forth the reasons *ex parte* relief is warranted, as required by Local Rule 7-19.  Instead, it merely asserts that: (1) there is a pending criminal investigation related to the forfeiture proceedings; (2) on February 17, 2016, Claimants propounded discovery on the government and on February 22, 2016, they served a document subpoena on CSC; and (3) "[a]bsent this stay the Government will either have to provide responses to the discovery requests and compromise its criminal investigation or selectively object to the responses and possibly compromise its criminal investigation."  Dkt. 56, pp. 2-3.  The government did not file a memorandum of points and authorities, any declarations, or any exhibits in support of the Application, and it made no attempt to advise the Magistrate Judge of the nature or extent of the proceedings to date.

## IV.  ARGUMENT.

**A.  *Ex Parte* Relief Is Unwarranted and Inappropriate.**

**1.  <u>The Legal Standard for Ex Parte Relief.</u>**

"*Ex parte* motions are rarely justified." *Mission Power Engineering Co. v. Continental Cas. Co.,* 883 F. Supp. 488, 490 (C.D. Cal. 1995).  "[E]*x parte* applications contravene the structure and spirit of the Federal Rules of Civil Procedure and the Local Rules . . . .  Both contemplate that noticed motions should be the rule and not the exception." *In re Intermagnetics America, Inc*., 101 B.R. 191, 193 (C.D. Cal. 1989).  "Timetables for the submission of responding papers and for the setting

of hearings are intended to provide a framework for the fair, orderly, and efficient resolution of disputes." *Id*. *Ex parte* applications, however, "throw the system out of whack" and "impose an unnecessary administrative burden on the court and an unnecessary adversarial burden on opposing counsel." *Id*. Accordingly, "opportunities for legitimate *ex parte* applications are extremely limited." *In re Intermagnetics America,* 101 B.R. at 193.

To justify *ex parte* relief, "the moving party must establish . . . that its cause will be irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures." *Buchanan v. Neighbors Van Lines*, 2010 WL 3815163, at *1 (C.D. Cal. Sept. 27, 2010); *Mission Power Engineering Co.,* 883 F. Supp. at 492 (C.D. Cal. 1995) (same). In addition, the moving party must establish "that it is without fault in creating the crisis that requires *ex parte* relief, or that the crisis occurred as a result of excusable neglect." *Buchanan*, 2010 WL 3815163, at *1; *Mission Power,* 883 F. Supp. at 492 (same).

"*Ex parte* applications are not intended to save the day for parties who have failed to present requests when they should have, and should not be used as a way to 'cut in line' ahead of those litigants awaiting determination of their properly noticed and timely filed motions." *In re Intermagnetics*, 101 B.R. at 193; *see also Mission Power*, 883 F. Supp. at 493 ("*Ex parte* applications are not intended to save the day for parties who have failed to present requests when they should have . . ."). "To show that the moving party is without fault, or guilty only of excusable neglect, requires more than a showing that the other party is the sole wrongdoer. It is the creation of the crises—the necessity for bypassing regular motion procedures—that requires explanation." *Id*.

Furthermore, to the extent the government's *Ex Parte* Application is in the nature of a "discovery motion" it cannot be heard *ex parte* "absent a showing of irreparable injury or prejudice not attributable to [the government's] lack of diligence . . . ." C.D. Cal. Local Rule 37-3.

- 8 -
**OPPOSITION TO *EX PARTE* APPLICATION TO STAY DISCOVERY**
189044.1

## 2. The Government Has Not Made the Showing of Irreparable Injury Required to Obtain Ex Parte Relief.

The government's attempt to proceed *ex parte* here is inherently unfair and problematic. The government filed its Application at the close of business on March 9, 2016, as part of a larger group of 12 interrelated filings that also included a Motion to Stay the Proceeding and Motion for Leave for In Camera Review, along with supporting declarations and proposed orders. Claimants were required to file this response to the Application in less than 24 hours, leaving them at a clear disadvantage given the multitude of filings and complexity of the issues presented.[2]

The government fails to provide a single reason why *ex parte* relief is warranted now, more than six months after it filed this action and when it was personally served with discovery requests on February 17, 2016 and with a Notice of Subpoena to CSC on February 19, 2016.

Moreover, the government could have filed a regularly noticed motion, accompanied by an *ex parte* application to shorten time or specially set its motion for a hearing. *See Moore*, 2015 WL 4636750, at *3 (denying *ex parte* application, and holding that proper procedure to prevent enforcement of deposition subpoena was to file motion to quash or modify subpoena or move for protective order, and then file an *ex parte* application to shorten time for the motion to be brought).

Certainly, the government was not obligated to wait until the discovery requests or CSC's responses to the subpoena were due before filing its Application. In *Mission Power Engineering*, the Court warned against just such pretextual justifications for seeking relief *ex parte*: "It is rare that a lawyer's credibility is more on the line, more vulnerable, than when he or she has created this kind of interruption.

---

[2] Indeed, if the Court is inclined to grant the *ex parte* application, it should permit Claimants to file supplemental briefing on an expedited, but reasonable, schedule. Given the time constraints Claimants are laboring under, this brief does not contain a complete discussion of the deficiencies in the government's Application, or the accompanying Motions.

Lawyers must understand that filing an *ex parte* motion . . . is the forensic equivalent of standing in a crowded theater and shouting, 'Fire!' There had better be a fire." 883 F. Supp. at 492.

### 3. The Government Could Have Readily Filed a Timely Motion Rather Than Filing an *Ex Parte* Application.

The Application should also be denied because any purported exigency is of the government's own making. *See Mission Power*, 883 F. Supp. at 493; *In re Intermagnetics*, 101 B.R. at 193. The government could have moved to stay the case as soon it filed its initial complaint, after it filed the FAC or SAC, or at any time before or after the February 1, 2016 scheduling conference. At the very least, the government could have advised the Court at the scheduling conference that it intended to move to stay the case, rather than allow the Court to set discovery cut-off and trial dates.

Furthermore, Claimants first served discovery on February 17, 2016. But the government did not promptly move to stay discovery. Instead, it waited nearly a month, when the discovery responses were about due, before filing for emergency *ex parte* relief at the close of business on March 9, 2016. Accordingly, the exigencies purportedly requiring relief were created, in whole or in part, by the government. *Ex parte* relief is not available under these circumstances.

## B. A Stay of Discovery Would Necessarily Modify the Scheduling Order
### 1. Legal Standard for Modifying a Scheduling Order.

Although not fashioned as a request to modify the scheduling order, the government's *Ex Parte* Application would inevitably require the Court to vacate the dates in its order. "A scheduling conference order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded without peril." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992) (internal quotation marks omitted). Once a scheduling order has been entered pursuant to Rule 16, the "schedule may be modified only for good cause and with the judge's consent."

Fed. R. Civ. P. 16(b)(4). "Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule 'if it cannot reasonably be met despite the diligence of the party seeking the extension.'" *Johnson*, 975 F.2d at 610 (quoting Fed. R. Civ. P. 16 Advisory Committee Notes to 1983 amendment). The "existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion." *Id*.

### 2. The Government has Failed to Establish Good Cause to Modify the Scheduling Order.

In its Application to stay discovery, the government, in essence, asks the Court to vacate its Scheduling Order. Yet the government has failed to demonstrate that there is "good cause" for such drastic relief. To the contrary, as shown below, its Application is based on faulty, unsubstantiated premises that its purported criminal investigation would somehow be compromised by Claimants' discovery requests that are limited to the allegations on the face of the government's SAC and that specifically exclude grand jury materials, witness statements and government work product.

### C. The Government Has Not Made Any Showing that an Immediate Stay of Discovery is Necessary to Avoid Adversely Affecting Its Ability to Conduct Its Purported Criminal Investigation of Mr. Pulier.

#### 1. A Stay Is Not "Mandatory."

Contrary to the government's suggestion in its Motion to Stay Proceedings, a stay of a civil asset forfeiture proceeding is not mandatory just because the government wants one. *See* 18 U.S.C. § 981(g). Rather, a stay is appropriate *only if* "the court determines that civil discovery will adversely affect the ability of the Government to conduct a related criminal investigation or the prosecution of a related criminal case." 18 U.S.C. § 981(g)(1). Moreover, the Court must "determine for

- 11 -
OPPOSITION TO *EX PARTE* APPLICATION TO STAY DISCOVERY

189044.1

itself whether civil discovery will adversely impact the criminal investigation or whether a protective order would suffice." *U.S. v. U.S. Currency in the Amount of $423,059.02*, 2012 WL 1950218, at *1 (W.D. Mo. 2012). "Conclusory reasons" are not enough, *id.*, "if the government fails to show that civil discovery will in fact adversely affect its criminal investigation, a stay should be denied." *U.S. v. Sum of $70,990,605*, 4 F. Supp. 3d 209, 212 (D.D.C. 2014).

In this case, the government has made no showing whatsoever that a stay of discovery is necessary. It has not identified any particular discovery that would interfere with its investigation; it has not identified any area of discovery that it would be unable pursue itself; and it has not shown why a more limited protective order would be insufficient.

**2.    The Government Makes No Showing that Claimant's Discovery Would Interfere With Its Investigation.**

The government's Application contends that the "civil discovery will adversely affect the ability of the government to conduct a related criminal investigation." App., p. 2. But the Application altogether fails to identify any particular discovery request that would adversely affect the government's purported criminal investigation. *See U.S. v. Sum of $70,990,605*, 4 F. Supp. 3d 209, 214 (D.D.C. 2014) (denying motion where "the United States does not point to any requests to depose law enforcement officials, or how particular requested discovery would adversely affect the investigation"). Rather, the government's position seems to be that *any* discovery would adversely affect the government in this case. However, "[t]here is no presumption that civil discovery, in itself, automatically creates an adverse affect on the government's related criminal proceeding." *U.S. v. All Funds ($357,311.68) Contained in N. Trust Bank of Fla. Account*, 2004 WL 1834589, at *2 (N.D. Tex. 2004). In the absence of such a showing, there is no basis for the extraordinary *ex parte* relief the government seeks.

OPPOSITION TO *EX PARTE* APPLICATION TO STAY DISCOVERY

189044.1

Nor can the government make such a showing here. The discovery at issue – some of which is not even mentioned in the government's papers – are: (1) a document subpoena to CSC; (2) document requests to the government tied to the specific allegations in the SAC; (3) interrogatories to the government concerning the SAC's contentions; and (4) requests for admissions to the government to clarify the basis of the government's forfeiture claims. As discussed below, each of Claimants' discovery requests are narrowly tailored to avoid concerns that they would adversely affect any investigation.

***Document Subpoena to CSC***. This action to forfeit the Twynham's home and money is highly unusual in that the government has admitted that the core fraud allegations of the SAC are lifted directly from CSC's civil complaint against Mr. Pulier. As that complaint puts at issue the same matters as are at issue in these forfeiture proceedings, there is no basis for any claim by the government that CSC's responses to the subpoena would in any way interfere with the government's purported criminal investigation. *See* Dkt. 54-3 (Claimants' Subpoena to Produce Documents to CSC (attached as Exhibit C to the Motion to Stay)).

***Document Requests***. Claimants' document requests are tied to specific allegations in the SAC, and thus are not likely to disclose any government litigation strategy that has not already been disclosed in the government's public filings in this case. *See* Dkt. 54-1 (Claimants' Requests for Production (attached as Exhibit A to the Motion to Stay)). Moreover, Claimants' expressly excluded from the ambit of their requests grand jury materials, witness statements and government work product.

***Interrogatories***. Claimants have propounded standard contention interrogatories. *See* Dkt. 54-2 (Claimants' Interrogatories (attached as Exhibit B to the Motion to Stay)). During meet and confer discussions prior to the filing of Claimants' Motion to Dismiss, the government invited Claimants to submit a list of questions seeking clarification concerning the government's forfeiture claims. Claimants did so, but the government never responded. Claimants' interrogatories

formally request the information that the government had previously indicated it was willing to provide, but never did. Moreover, the mere fact that the government must provide some evidentiary basis for its allegations, standing alone, is by no means reason for concluding that the requests would adversely affect the government's ability to pursue its purported criminal investigation.

*Requests for Admission*. Claimants' requests for admission only require the government to admit or deny the existence of a factual basis for what it is alleging in the SAC. Claimants have a right to know what they must be prepared to defend against in this case. (The government does not even mention Claimant's requests for admission in its Motion to Stay Proceedings, evidencing how little consequence they are to the government's criminal investigation.)

### 3. The Government Makes No Showing that a Protective Order Would Be Insufficient to Protect Its Interests.

Equally telling is the government's attempt to preclude all discovery, rather than seek a protective order. A stay may be "unnecessary if a protective order limiting discovery would protect the interest of one party without unfairly limiting the ability of the opposing party to pursue the civil case." 18 U.S.C. § 981(g)(3). Assuming there are grounds for a protective order here (which Claimants in no way concede), the government has not even attempted to show why it is seeking a stay of all discovery, instead of an appropriately tailored protective order. *See United States v. Sum of $70,990,605*, 4 F. Supp. 3d 209, 214 (D.D.C. 2014) (allowing claimants to "seek discovery that would not implicate the sensitive information that the government seeks to protect" because "a well-crafted protective order limiting discovery could 'protect the interest' of the government while preserving the ability of the claimants to pursue the civil case").

//
//
//

## VI. CONCLUSION.

For the foregoing reasons, the Court should deny the government's *Ex Parte* Application for an Order Staying Discovery.

DATED: March 10, 2016   **ISAACS | FRIEDBERG LLP**

*/s/ Jeffrey Isaacs*
Jeffrey B Isaacs, Esq.

**THEODORA ORINGHER PC**

*/s/ David Kettel*
David A. Kettel, Esq.

*Attorneys for Claimants*
*Bradley Twynham and Mariel Twynham*