UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 15-06794 RGK (AJWx) | Date | March 15, 2016 |
|---|---|---|---|
| Title | *United States of America v. Real Property Located In Brentwood, California, Twynham* | | |

| Present: The Honorable | R. GARY KLAUSNER, U.S. DISTRICT JUDGE | | |
|---|---|---|---|
| Sharon L. Williams (Not Present) | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| Not Present | | Not Present |

**Proceedings:**      **(IN CHAMBERS) Order Re: Claimants' Motion to Dismiss (DE 45)**

## I.     INTRODUCTION

On September 2, 2015, United States of America ("Plaintiff") filed a complaint against Real Property Located in Brentwood, California ("Defendant Real Property") and $13,271.07 Seized from Premier America Credit Union Account Number XXXXXX5967 ("Defendant Bank Funds"). In the complaint, Plaintiff asserted a claim for civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

Since then, Plaintiff has filed two amended complaints. In its Second Amended Complaint ("SAC"), Plaintiff maintains the civil forfeiture claim, but now asserts the claim pursuant to both subsections (A) and (C) of 18 U.S.C. § 981(a)(1). By way of this action, Plaintiff seeks forfeiture of Defendant Real Property and Defendant Bank Funds to the United States of America for disposition according to law. Titleholders and Claimants of the Defendant Real Property and Defendant Bank Funds are Bradley and Mariel Twynham, husband and wife ("Claimants").

Presently before the Court is Claimants' Motion to Dismiss. For the following reasons the Court **DENIES** Claimants' Motion.

## II.     FACTUAL BACKGROUND

The following facts are taken from Plaintiff's SAC.

On October 29, 2013, Computer Services Corporation ("CSC"), a publicly traded tech company headquartered in Virginia, contracted to acquire all of the outstanding stock of ServiceMesh, a tech company based in California and run by CEO Eric Pulier ("Pulier"). According to this contract (the "Purchase Agreement"), CSC would acquire ServiceMesh's outstanding stock for a fixed cash amount at closing, plus an incentive payment ("Earnout Amount"). This Earnout Amount would be based on ServiceMesh's revenues between January 1, 2013 and January 31, 2014 ("Earnout Period").

The Commonwealth Bank of Australia ("CBA") was one of the main sources of revenue for ServiceMesh during the Earnout Period. Pulier's friends, Jon Waldron ("Waldron"), Keith Hunter ("Hunter"), and Hans Gyllstrom ("Gyllstrom"), all worked at CBA during the Earnout Period. Bradley Twynam ("Twynham"), a ServiceMesh employee, helped manage ServiceMesh's relationship with CBA. During the Earnout Period, these six individuals conspired to expedite deals between CBA and ServiceMesh to inflate ServiceMesh's revenue, and agreed to disburse a portion of the inflated Earnout Amount to themselves.

The day before the end of the Earnout Period, Pulier provided CSC with a Letter of Representation ("LOR"). The LOR certified to CSC that ServiceMesh, among other things, did not enter into any side agreements with customers in relation to transactions during the Earnout Period. This representation was false.

Based on the false representation in the LOR, CSC disbursed an inflated Earnout Amount of $98,034,058.00. Over $4.7 million of the Earnout Amount was later transferred to an account in the name of ACE, Inc. ("ACE"). ACE is a non-profit entity controlled by Andrew Goldstein, Pulier's longtime friend. CBA and CSC investigations revealed that the value of the products delivered by ServiceMesh to CBA was inflated by approximately 65%, and that Waldron, Hunter, and Gyllstrom received almost $3 million in payment transfers through ACE.

Twynham received $935,529.02 from the CSC payout and subsequently acquired Defendant Real Property for $1,730,000.00, with a down payment of approximately $700,000.00. The majority of the down payment was paid via wire transfer from the bank account holding Twynham's CSC payout money. Defendant Bank Funds represents the amount of money remaining in Twynham's account.

Plaintiff now alleges that these events represent a scheme by certain ServiceMesh employees to fraudulently inflate its revenue to generate a higher Earnout Amount for distribution as income for themselves and bribes and kickbacks for their accomplices. The result was that CSC, a publicly traded company, overpaid ServiceMesh by approximately $98 million.

### III.  JUDICIAL STANDARD

To survive a motion to dismiss, a complaint must allege a "cognizable legal theory." *Shroyer v. New Cingular Wireless Services, Inc.* (9th Cir. 2010) 622 F3d 1035, 1041 (quoting *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001). In addition, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible if the plaintiff alleges enough facts to draw a reasonable inference that the defendant is liable. *Id.* A plaintiff need not provide detailed factual allegations but must provide more than mere legal conclusions. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. When ruling on a Rule 12(b)(6) motion, the court must accept the allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).

In addition to satisfying the court's standards set forth in *Iqbal*, in an *in rem* forfeiture action arising from a federal statute, a court must apply the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), which provide a slightly higher pleading standard. Fed. Supp. R. Civ. P. A(1)(B); *U.S. v. Aguilar*, 782 F.3d 1101, 1108 (9th Cir. 2015). The "sufficiency of the complaint is governed by Supplemental Rule G(2)," under which the government's complaint must "state sufficiently detailed facts to support a *reasonable belief* that the government will

be able to meet its burden of proof at trial." Fed. Supp. R. Civ. P. G(2)(f)(emphasis added); *Aguilar*, 782 F.3d at 1108.[1]

## IV. DISCUSSION

Plaintiff alleges that Defendant Real Property and Defendant Bank Funds are subject to civil forfeiture because they are traceable to proceeds of one or more acts of wire fraud under 18 U.S.C. § 1343. Additionally, Plaintiff alleges that Defendant Real Property is subject to civil forfeiture because it constitutes property involved in transactional money laundering under 18 U.S.C. § 1957, with the specified unlawful activity being wire fraud. Here, Claimants argue that Plaintiff has failed to allege the elements of wire fraud under § 1343 and transactional money laundering under § 1957. Without sufficiently pleading the elements of these claims, Plaintiff cannot show that Defendant Real Property or Defendant Bank Funds are subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) or (C).

For the following reasons, the Court **DENIES** Claimants' Motion.

### A. Plaintiff Sufficiently Alleges the Elements of Wire Fraud Under 18 U.S.C. § 1343

Claimants contend that Defendant Real Property and Defendant Bank Funds are not subject to civil forfeiture pursuant to § 981(a)(1)(C) because Plaintiff does not allege with sufficient particularity facts establishing the elements of wire fraud under § 1343. The Court disagrees.

To state a claim for wire fraud under § 1343, a plaintiff must allege the following: (1) a scheme to obtain money or property by false or fraudulent representation; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud. *U.S. v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013). Further, the Supreme Court held in *Neder v. United States* 527 U.S. 1, 25 (1999) that in instances of wire fraud, a plaintiff must prove materiality as to the deceptive conduct underlying the scheme to defraud.

#### 1. *Scheme to Defraud*

A scheme to defraud refers to "wronging one in his [money or] property rights by dishonest methods or schemes," or "the deprivation of something of value by trick, deceit, chicane or overreaching." *U.S. v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989). This non-technical standard seeks an "arrangement of words or the circumstances in which they are used" that "may create an appearance which is deceptive, even if the words themselves fall short of this." *U.S. v. Woods*, 335 F.3d 993, 997-98 (9th Cir. 2003).

Plaintiff's SAC alleges that toward the end of the Earnout Period, ServiceMesh provided CSC with an LOR that represented, among other things, that ServiceMesh did not enter into any side agreements with customers in relation to the Earnout Period transactions. (Pl.'s SAC, ¶34, ECF 30.) Contrary to the representation in the LOR, ServiceMesh and CBA employees agreed to inflate ServiceMesh revenues so ServiceMesh shareholders could receive a higher payout and the CBA employees could receive kick-backs. The SAC specifically alleges that during the Earnout Period, CBA and ServiceMesh employees exchanged several emails demonstrating efforts to expedite unfair deals between the two companies. (Pl.'s SAC, ¶¶21-34, ECF 30.) The SAC alleges that in these deals with

---

[1] Ninth Circuit case-law is largely silent on whether Rule 9(b) pleading standards for fraud apply when the pleading standards for the Supplemental Rules are also in effect. Due to the lack of clarity on the issue, the Court will not apply Rule 9(b) standards to Claimants' Motion. Nevertheless, even if the Court did apply Rule 9(b) standards to the Motion, Plaintiff's claims would likely survive.

CBA, ServiceMesh inflated the prices of its products in order to increase the Earnout Amount and boost the CSC payout amount for ServiceMesh shareholders. (Pl.'s SAC, ¶¶21-34, 52, ECF 30.) The SAC alleges that after the CSC payout, over $4.7 million payout dollars were transferred to a third-party account held by ACE. (Pl.'s SAC, ¶43, ECF 30.) The SAC alleges that almost $3 million was then transferred from the ACE account to the CBA employees who helped consummate the price-inflated deals with ServiceMesh. (Pl.'s SAC, ¶45, ECF 30.) Taken as true, these allegations show ServiceMesh did, in fact, enter into side deals with CBA. These side deals helped boost ServiceMesh's revenue during the Earnout Period, thus increasing the payout to ServiceMesh shareholders. Thereafter, certain ServiceMesh shareholders provided kick-backs to the CBA employees who helped ServiceMesh generate the inflated revenues. Thus, Plaintiff states sufficient detailed facts to show that there was a scheme to obtain money or property from CSC by false or fraudulent representation

2. *Use of Interstate Wires in Furtherance of a Scheme to Defraud*

Under § 1343, a plaintiff must prove that a defendant, in committing fraud, "transmit[ted] or cause[d] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such [fraudulent] scheme." The mailing need be only a "step in [the] plot" or "incident to an essential part of the scheme." *U.S. v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000) (citing *Schmuck*, 489 U.S. 705).

Here, Plaintiff alleges that the LOR was sent from the CEO of ServiceMesh, headquartered in California, to CSC and its executives, headquartered in Virginia. (Pl.'s SAC, ¶34, ECF 30.) Next, the SAC alleges that to execute the scheme, ServiceMesh employees in the United States exchanged emails with CBA employees in Australia. (Pl.'s SAC, ¶¶ 23, 24, 25, 31, 33, ECF 30.) Taken as true, Plaintiff's allegations adequately allege that there were interstate communications in furtherance of a scheme to defraud CSC.

3. *Intent to Defraud*

To find an intent to defraud, a court must find the willful participation in a scheme "with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved." *U.S. v. Manion* 339 F.3d 1153, 1156 (9th Cir. 2003). Intent can be inferred from statements or conduct and is shown if a representation is made with reckless indifference to its truth or falsity. *U.S. v. Cusino*, 694 F.2d 185, 187 (9th Cir. 1982).

First, as determined earlier, Plaintiff alleges sufficient facts to permit the inference that there was a scheme to obtain money from CSC by entering into side deals to inflate revenues and boost the Earnout Amount, thereby generating income for ServiceMesh shareholders.

Further, Plaintiff alleges that Pulier sent the LOR, which represented to CSC that ServiceMesh did not enter into any side agreements in connection with ServiceMesh sales during the Earnout Period. (Pl.'s SAC, ¶34, ECF 30.) However, email and text message exchanges between ServiceMesh and CBA employees indicate that side deals were, in fact, made between the two companies in connection with the CSC Earnout Amount. (Pl.'s SAC, ¶ 39-44, ECF 30.)

Taken as true, Plaintiff's allegations establish that at a minimum, Pulier made false representations to CSC with reckless indifference to its truth or falsity.

4.      *Materiality*

A misrepresentation is material when it "is made to induce action or reliance by another" or has "a natural tendency to influence or is capable of influencing another's decisions." *U.S. v. LeVeque*, 283 F.3d 1098, 1103-04 (9th Cir. 2002). "It is the materiality of the scheme or artifice that must be alleged; the materiality of a specific statement need not be pleaded." *U.S. v. Omer*, 395 F.3d 1087, 1089 (9th Cir. 2005).

In its SAC, Plaintiff alleges, "Based on the representations from Pulier and ServiceMesh that it legitimately exceeded the Earnout Amount revenue floor, CSC disbursed $98,034,058.00 to the Exchange Agent Account on March 14, 2014. But for these representations, CSC would not have paid the Earnout Amount." (Pl.'s SAC, ¶36, ECF 30.)

These allegations adequately establish materiality.

Thus, Plaintiff pleads sufficient facts to support the reasonable belief that Plaintiff will be able to fulfill its burden of proof at trial for wire fraud under § 1343.

**B.      Plaintiff Sufficiently Alleges the Elements of Transactional Money Laundering Under 18 U.S.C. § 1957**

Plaintiff alleges that Defendant Real Property constitutes property involved in one or more transactions in violation of 18 U.S.C. § 1957. (Pl.'s SAC, ¶56, ECF 30.) Specifically, Plaintiff alleges that Defendant Real Property was purchased using the criminal proceeds of the above mentioned wire fraud. (Pl.'s SAC, ¶56, ECF 30.) Plaintiff alleges that as a result, Defendant Real Property is subject to civil forfeiture under § 981(a)(1)(A). (Pl.'s SAC, ¶56, ECF 30.)

To properly allege transactional money laundering under § 1957, a plaintiff must show that: (1) defendant knowingly engaged in a monetary transaction; (2) [knowing that] the transaction involved criminal property; (3) the property's value exceeded $10,000 ; and (4) the property was derived from a specified unlawful activity. *U.S. v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003)

Claimants argue that Plaintiff's claim of transactional money laundering is insufficient because (1) it fails to allege a specific unlawful activity upon which Plaintiff's money laundering theory is predicated; (2) it fails to allege that Twynham knowingly engaged in the monetary transaction that violated § 1957; (3) it fails to allege that Twynham knew the monetary transaction involved criminal property.

As to Claimants' first argument, the Court has already established that Plaintiff has sufficiently alleged all the elements of wire fraud under §1343. Therefore, Claimants' first argument is unpersuasive.

As to Claimants' second argument, the SAC alleges that on March 17, 2014, $935,539.02 were transferred to Twynham's personal account. (Pl.'s SAC, ¶55, ECF 30.) The SAC further alleges that Twynham acquired Defendant Real Property with a down payment of approximately $700,000.00, the majority of which was paid for with a wire transfer from Twynham's personal account holding his share of the Earnout Amount payout. (Pl.'s SAC, ¶56, ECF 30.) These allegations sufficiently support the claim that Twynham knowingly engaged in monetary transactions in violation of § 1957. Despite Claimants' position that Plaintiff must *also* establish that *all* the funds used to purchase the Defendant Real Property were criminally-derived, the Ninth Circuit has already stated that even if a plaintiff "may not be able to show all the funds are tainted and subject to forfeiture, this does not render the complaint

deficient." *Aguilar*, 782 F.3d at 1109. It is sufficient that a plaintiff establishes that a defendant knowingly engaged in a monetary transaction, because "tracing [criminal proceeds] is not an issue at the motion to dismiss stage." *Id*. Therefore, Plaintiff sufficiently demonstrates that Twynham knowingly engaged in the monetary transaction violating § 1957.

As to Claimants' final argument, the facts alleged in the SAC permit the reasonable inference that Twynham knew that the monetary transaction involved criminal property. Plaintiff alleges that text messages sent between Twynham, Waldron, and Hunter discuss the formula used to calculate the amount of kick-back money to be received by the CBA employees. (Pl.'s SAC, ¶41, ECF 30.) Further, email allegations dating back to November 2, 2013, suggest that Twynham was an integral part of securing multiple deals between ServiceMesh and CBA, and securing revenue figures on these deals for revenue recognition purposes. (Pl.'s SAC, ¶¶23, 24, 25, 27, 31, 33, ECF 30.) Therefore, Plaintiff's allegations demonstrate Twynham's deep involvement in the deals between CBA, ServiceMesh, and CSC. Taken as true, these facts suggest that Twynham knew about the kick-backs to CBA executives; the Earnout Amount, including his share; and that these funds were the result of unlawful and fraudulent activities.

## V.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Claimants' Motion to Dismiss.

**IT IS SO ORDERED.**

|  :  |
|---|
| Initials of Preparer |